# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>BRITT ARTHUR LANDER,<br><br>    Defendant. | No. CR22-4071-LTS<br><br>MEMORANDUM OPINION AND ORDER ON REPORTS AND RECOMMENDATIONS |

## I. INTRODUCTION

This matter is before me on two Reports and Recommendations filed by Chief United States Magistrate Judge Kelly K.E. Mahoney. In one (Doc. 52), she recommends that I deny defendant Britt Lander's motion (Doc. 34) to suppress evidence. In the other (Doc. 70), she recommends that I deny Lander's supplemental motion (Doc. 64) to suppress evidence. Lander has filed timely objections (Docs. 55, 68, 81, 82). The Government has filed a response (Doc. 72) to the Report and Recommendation (R&R) concerning Lander's first motion to suppress.

## II. BACKGROUND

### A. *Procedural History*

On October 13, 2022, the Grand Jury returned an indictment[1] charging Lander with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 and 851.

Lander filed his first motion (Doc. 34) to suppress on January 26, 2023, and the Government filed its resistance (Doc. 38) on February 10, 2023. Judge Mahoney held a

---

[1] A criminal complaint (Doc. 2) was filed against Lander on September 27, 2022.

hearing on March 8, 2023. Doc. 48. The Government presented testimony from Austin Schuller and Ryan Pennock. Lander testified on his own behalf. Judge Mahoney admitted Government Exhibit 1 and Defense Exhibits A through D. *Id.*

Judge Mahoney issued her first R&R (Doc. 52) on March 28, 2023. Lander filed his objections (Doc. 55) on April 11, 2023, and subsequently filed a brief (Doc. 68) after submission of the transcript. Judge Mahoney then permitted Lander to file a supplemental motion (Doc. 64) to suppress based on the same record. She issued her R&R (Doc. 70) on the supplemental motion on May 11, 2023. On May 19, 2023, the Government filed a response (Doc. 72) to Lander's objections to the first R&R. On May 24, 2023, Lander filed objections (Docs. 81, 82) to the second R&R. Trial is scheduled to begin July 17, 2023.

### B. *Relevant Facts*

Judge Mahoney provided the following factual background in her first R&R based on the testimony presented at the hearing, to which Lander has raised no objection:

> On the afternoon of June 21, 2022, Alcester Police Department Chief Austin Schuller conducted a traffic stop of a vehicle driven by Lander based on a missing front license plate. Lander admitted he did not have a valid license (dispatch later informed Chief Schuller it was revoked). Def. Ex. A. Chief Schuller asked Lander to come sit in the police car while he completed paperwork. *Id.* When Lander exited his car, Chief Schuller began a pat-down search, and Lander revealed a methamphetamine pipe, a marijuana pipe, rolling papers, and "a little bit of marijuana" in his pockets. *Id.*
>
> Another officer arrived on the scene, and Chief Schuller directed him to begin searching Lander's car. *Id.* Ultimately, law enforcement found two packages of methamphetamine weighing a combined 7 grams (with packaging).
>
> During questioning in Chief Schuller's patrol car, Lander indicated that he was meeting a friend on this road for a car part. *Id.* As the name of the friend was a known drug target, Chief Schuller contacted South Dakota Criminal Investigation Agent Ryan Pennock. Chief Schuller also

2

moved Lander from the front seat of the patrol car to the backseat, stating that he was not under arrest but that he would read him his *Miranda* rights to be safe; Lander indicated he understood his rights and that he did not have to talk (by nodding his head). *Id.* Chief Schuller continued to question Lander about his plans that day, and Lander repeatedly denied that the purpose of the meet-up was to buy drugs. *Id.* Ultimately, Chief Schuller arrested Lander and transported him to the Alcester police station.

Chief Schuller testified at the suppression hearing that during the initial encounter, Lander appeared nervous but not impaired. He testified that observed signs of impairment included heightened nervousness, tense facial muscles, and fidgety hands, but that he ultimately determined Lander did not need to undergo field sobriety tests. He testified that Lander became more comfortable with time. He acknowledged that Lander repeatedly asked him to retrieve a soda pop from his car, which he did eventually, and that he gave Lander a bottle of water in the interview room, but he did not assign any significance to Lander's thirst.

Chief Schuller's body camera footage of the encounter shows that Lander appeared to be talking normally and in a manner indicating comprehension. *Id.* It also suggests that Chief Schuller was more concerned about Lander's substance use during the encounter than his testimony at the hearing let on. Once Lander was in the patrol car for questioning (and after Chief Schuller found the methamphetamine pipe and other items on his person), Chief Schuller asked Lander when he had last used. *Id.* Lander responded, "not today." *Id.* Chief Schuller then asked to look at his eyes. After continued questioning from Chief Schuller about Lander's plans that day (and whether they included buying drugs), Lander responded to a question by talking very quickly and in a manner that was hard to understand. *Id.* Chief Schuller told Lander that he was currently giving him some indications of controlled substance use. *Id.* Lander explained that he gets really nervous around cops, even if he has not done anything wrong. *Id.* Chief Schuller told Lander that he was going to conduct field sobriety tests (he never did). *Id.* Chief Schuller continued talking to Lander about his plans, and Lander revealed that he and his friend had agreed to meet on 306th Street without specifying a time. *Id.* Chief Schuller contacted other law enforcement to look for the drug target on 306th Street, not 302nd Street (the road they were currently on), saying that Lander was "so screwed up he thought he was on 306." *Id.* Once at the station, Chief Schuller again asked Lander if he had used that day, adding, "'cause your actions kind of . . ." and trailing off. *Id.* Lander's response

3

was mumbled but included that "it don't matter anyway," that he hates lying and liars, that he doesn't want to be a liar, and that he doesn't want to be a drug addict but is one." *Id.*

Agent Pennock arrived at the station and began interviewing Lander around 3:15 p.m., less than an hour after Chief Schuller had read Lander his *Miranda* rights. Recordings of the interview show that Lander initially spoke fast, was hard to understand, and gave rambling responses (*id.*; Govt. Ex. 1) – which is consistent with Agent Pennock's testimony that Lander was extremely nervous at the beginning of the interview but became more relaxed as time went on. Agent Pennock introduced himself and explained the benefits of cooperation. *Id.* Lander indicated that he did not want to be "that guy" again, saying several times that he was a drug addict and could not kick the habit. *Id.* After about four minutes of back-and-forth where Agent Pennock tried to convince Lander to cooperate, Agent Pennock re-read Lander his *Miranda* rights, speaking very quickly. *Id.* After Agent Pennock said an attorney would be appointed if he could not afford one, Lander indicated he could not afford anything. *Id.* Agent Pennock reiterated that one would be appointed then. *Id.* Agent Pennock further explained:

> Just because you agreed to those, as [Chief Schuller] said that you had, right, if there's something that I ask you, and you're like, . . . I'm not telling you that, [just say you're] not telling me that. No pressure.

*Id.* Lander responded, laughing as he said it, "My old lady is my attorney, I want her present." *Id.* Agent Pennock responded that "the reason we don't do that is a number" and that two people cannot keep a secret. *Id.* Lander continued to talk about his significant other and his trust in her, requesting her presence. *Id.* Agent Pennock said that Lander could tell her all about it later. *Id.* Agent Pennock then began questioning Lander about the events of that day. *Id.* The video evidence shows that during this portion of the interview, Lander's responses were coherent, that he rambled less, and that he talked slower – consistent with Agent Pennock's testimony that Lander's nerves lessened as the interview went on. Agent Pennock testified that Lander may have been under the influence but that he was not so intoxicated that his cognitive abilities were affected. Agent Pennock noted no delays between his questions and Lander's answers and no instances where Lander's responses indicated confusion.

4

> Agent Pennock's interview lasted less than two hours. At its conclusion, due to his cooperation, Lander was released.
>
> . . . .
>
> At the hearing, Lander testified that he had been released from jail on June 14, 2022, and that he had steadily used methamphetamine from that time to the time of the traffic stop on June 21. He testified to methamphetamine usage every few hours and that he did not recall sleeping. He indicated that he had started the week with a half ounce of one kind of methamphetamine and an 8 ball of another kind of methamphetamine, approximately 17 to 19 grams in total, and that the methamphetamine found during the traffic stop (measuring 7 grams) was all that remained (meaning he had consumed 10 to 12 grams of methamphetamine in the week leading up to the traffic stop). He testified that during the interview, he was not in his right mind, as he could not sit still and he needed to sleep. He said he felt like he was dying of thirst, and he did not understand what was going on. He did not think he was able to make coherent decisions and felt pressured to talk, and he asked for his fiancé's presence during the interview because he felt like he was making the wrong decision and being tricked.

Doc. 52 at 1-5 (internal footnotes omitted).

### III. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

5

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## IV. DISCUSSION

### A. First R&R

Lander argues Judge Mahoney erred in finding that the Government had shown that Lander understood his *Miranda* rights at the time he was apprehended because she disregarded evidence showing that Lander was so fatigued or impaired that he was unable to knowingly, intelligently and voluntarily waive those rights. He relies on his testimony from the hearing that since his release from jail on June 14, 2022 (seven days prior to his arrest in this case), he had ingested methamphetamine every hour or two, totaling approximately 17 grams of methamphetamine, and had not slept during that time. *See* Doc. 63 at 52-57. Lander testified he last used methamphetamine approximately 30 minutes before he was stopped by Schuller. *Id.* at 64. Schuller testified that in his experience in law enforcement, individuals typically exhibit symptoms of tiredness, thirst

6

and confusion when they have not slept for several days. *Id*. at 20. He observed that Lander had heightened nervousness and tense muscles, including tense facial muscles, which he associated with stimulant use, such as methamphetamine. *Id*. at 9, 20. He also observed Lander pick at his hands. *Id*. at 20.

After summarizing the relevant law, Judge Mahoney concluded Lander was not so fatigued or impaired that he was unable to knowingly, intelligently and voluntarily waive his *Miranda* rights:

> Here, although there is some evidence that Lander was under the influence (including speaking fast, rambling at times, and fidgeting), the audio and video recordings show he was "in control of his faculties" and not "so intoxicated that he was unaware of his rights and the consequences of waiving those rights." The interrogation was relatively short, less than two hours, and Lander had prior experience with law enforcement. Less than an hour before the interrogation, Lander affirmatively indicated he understood his rights and that he did not have to talk to law enforcement; and he was reminded of his *Miranda* rights before saying too much during the interview (law enforcement did not ask whether he understood his rights a second time, however). Lander admitted to being a drug addict, and law enforcement suspected he might have recently used methamphetamine, but Lander did not tell law enforcement the extent of his use nor that he had not slept for multiple days. Lander answered law enforcement's questions in a coherent manner and did not indicate that he was confused or felt compelled to speak.

Doc. 52 at 7 (internal footnotes omitted).

A valid waiver of *Miranda* rights must be voluntary, knowing and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To be voluntary, it must be the product of "a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010). For a waiver to be knowing and intelligent, the suspect must have waived his rights "with awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. "The government has the burden of proving the validity of the *Miranda* waiver by a

preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

"Sleeplessness, alcohol use and drug use are relevant . . . but '[i]ntoxication and fatigue do not automatically render a confession involuntary.'" *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quoting *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)). The test is "whether these mental impairments caused the defendant's will to be overborne" by examining the totality of the circumstances. *Id*. The Eighth Circuit has found, in numerous instances, that a defendant under the influence of methamphetamine was able to provide a voluntary, knowing and intelligent waiver. *See United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006) (while defendant "may have been under the influence of methamphetamine at the time of his arrest, . . . the evidence does not suggest that he was so intoxicated that he was not 'competent to understand the nature of his acts.'"); *Gaddy*, 532 F.3d at 788 (finding a valid waiver of rights where defendant had consumed alcohol, pain killers, muscle relaxants, and a mixture of cocaine and marijuana several hours before waiving his rights where two agents testified the defendant "appeared awake and coherent."); *Casal*, 915 F.3d at 1229 (finding valid waiver of rights where defendant had recently used methamphetamine and had not slept for five days).

Unlike some of the above cases, law enforcement did notice signs that Lander had been using methamphetamine. Schuller observed nervousness, muscle and facial tenseness and difficulties sitting still. However, I agree with Judge Mahoney that none of these symptoms were so severe as to suggest Lander's will was overborne. While Lander testified he had consumed large amounts of methamphetamine over the course of multiple days and had not slept for multiple days, he did not inform law enforcement of this or exhibit symptoms to the point that the officers believed they needed to conduct a driving-under-the-influence investigation or stop the interview. Doc. 63 at 23, 43. Schuller and Pennock also testified they did not notice signs of tiredness. *Id*. at 26, 36.

8

Lander does not point to anything he said during the course of his interview that would suggest he was confused or not thinking clearly. He promptly responded to questions and answered them appropriately. Nothing in Lander's objections raise an issue that Judge Mahoney did not consider. Having reviewed the totality of circumstances myself, I agree with her conclusion that Lander was not so fatigued or impaired that he was unable to knowingly, intelligently and voluntarily waive his *Miranda* rights. Lander's objections to the first R&R are overruled.

### B. *Second R&R*

In his supplemental motion to suppress, Lander argued that he invoked his right to an attorney when he requested the presence of his "old lady" (his domestic partner). Judge Mahoney recommends denying the motion:

> Lander does not cite to any cases in which a court has found invocation based on a request for lay counsel. He relies on *United States v. Eastman*, in which the District of South Dakota noted it was "not clear whether a person who is admitted to practice law in tribal court, but not elsewhere, is a 'lawyer' within the meaning of *Miranda*"; the court ultimately declined to resolve the issue because the defendant had not clearly and unambiguously requested the tribal public defender's presence. Lander also cites a Seventh Circuit case in which the court held a juvenile's "request for his father [did not] constitute[] an invocation of . . . his right to counsel." The court rejected a categorical rule, however, in part because "under *Miranda* a request for an attorney need not be clear and unequivocal." This is no longer the standard. In any event, these cases can be distinguished – there is a better argument for invocation based on a request for a tribal advocate, or a juvenile's request for a parent who has the ability to retain a lawyer for the juvenile, than here, where Lander wanted to consult his spouse, who "was not in a position to advise the accused as to his legal rights" or otherwise "a trained advocate, skilled in the presentation of the interests of h[er] client."

Doc. 70 at 2-3 (internal footnotes omitted). In his objections, Lander argues that he was too fatigued, intoxicated and impaired to "clearly and unambiguously" articulate that he wanted an attorney. I have already concluded that Lander was not so fatigued or impaired

9

that he could not voluntarily, knowingly and intelligently waive his *Miranda* rights, which includes his right to an attorney.

The record demonstrates that Lander requested to consult his spouse or domestic partner, which does not constitute a clear and unequivocal invocation of his right to counsel. Lander's objections to the second R&R are overruled.

## V. CONCLUSION

For the reasons set forth herein:

1. Lander's objections (Docs. 55, 68, 81, 82) to the Reports and Recommendations (Doc. 52, 70) are **overruled**;
2. I **accept** both Reports and Recommendations (Docs. 52, 70) **without modification**;
3. Pursuant to Judge Mahoney's recommendations, Lander's motions (Docs. 34, 64) to suppress are **denied**.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2023.

_____
Leonard T. Strand, Chief Judge